IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FREDDIE L. BRADSHAW, #195044<br>Plaintiff | * | |
| v. | * | CIVIL ACTION NO. CCB-08-341 |
| WARDEN NANCY L. ROUSE<br>LT. BRIAN SMITH | * | |
| CASE MANAGER SUPERVISOR O.<br>  BRAKE | * | |
| SECRETARY OF D.P.S.C.S. GARY<br>  MAYNARD | * | |
| COMMISSIONER OF CORRECTIONS<br>  J. MICHAEL STOUFFER | * | |
| WARDEN JOHN ROWLEY<br>PH.D. JAMES K. HOLWAGER | * | |
| ASST. WARDEN RICHARD GRAHAM<br>CASE MANAGER SUPERVISOR LILLER | * | |
| CASE MANAGER SPECIALIST DUNST<br>Defendants | * | |
| | *** | |

MEMORANDUM

Pending are defendants' supplemental motion to dismiss or for summary judgment and plaintiff's self-represented opposition.[1] ECF Nos. 46 & 48. The case is ripe for dispositive review.[2] Upon review of papers and exhibits filed, the court finds an oral hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2010).

**Background**

---

[1] Plaintiff has also filed a declaration for entry of default. ECF No. 49. He seeks the entry of default judgment for defendants' failure to respond to his opposition. That defendants chose not to file a reply to the opposition does not merit the entry of default judgment. The motion shall be denied.

[2] Defendants' original motion to dismiss or for summary judgment and plaintiff's cross-motion for summary judgment were denied without prejudice on February 27, 2009. The case was stayed at that time pending the proceedings in *Cabana v. Warden, et al.*, Civil Action No. JFM-07-2205 (D. Md.). ECF No. 31. On March 19, 2010, the stay was lifted, counsel was ordered to supplement the existing record, and the parties were granted additional time to file supplemental responsive pleadings. ECF No. 37. The court has considered all responsive pleadings in issuing this opinion.

Plaintiff is a Division of Correction ("DOC") inmate who alleges that on July 3, 2007, he was removed from general population at the Maryland Correctional Institution at Hagerstown ("MCIH") and placed on administrative segregation by former MCIH Warden Nancy Rouse. He claims he was served with a notice, but was not given an opportunity to be heard. ECF No. 1. Plaintiff asserts that after filing a number of complaints with Rouse, Lt. Brian Smith, and Case Manager Supervisor Brake regarding why he was placed on administrative segregation, on August 2, 2007, he was transferred to the Special Management Unit ("SMU") of the North Branch Correctional Institution ("NBCI") without prior notice and without a chance to contest the allegations used to place him on the SMU.

Plaintiff complains that his transfer was "punitive." He claims that as of the filing date of his complaint, he had not been given a written factual basis for his placement on the SMU, but had only been provided vague explanations for the assignment related to behavior, security, and confidentiality. *Id*. Added to these initial due process claims is plaintiff's assertion that the conditions of SMU are "atypical" as his assignment is tantamount to indefinite placement on solitary confinement and includes the confiscation of property and the revocation of privileges, with the exception of one-hour of "fresh air" per week while in full restraints, and twice weekly showers, which can be revoked for talking to other inmates.[3] Plaintiff also complains that he is subject to a Behavioral Management Program ("BMP") while on SMU which allows for inmates to achieve one of six "levels," subject to the "whims and mercy" of SMU officers and the levels committee. He

---

[3] The conditions under which plaintiff was confined in the SMU included 24 hour cell-restriction with only one hour for recreation each week, during which plaintiff was taken to an outdoor recreation cage and restrained with leg irons, handcuffs, a security box, and a waist chain. ECF No. 1 at 8. He contends that his shower privileges were curtailed for not participating in the SMU programs, for talking to other inmates, or for "fishing a kite" (passing a written message to other prisoners by attaching a string to it) out the cell door to other inmates. *Id*. at 6-8.

claims that he has been on the BMP intake level since his arrival at NBCI, even though he has received no infractions. ECF No. 1. Plaintiff also complains that Division of Correction directives ("DCD") permit his placement in such conditions for being "directly involved or associated with violent behavior." He complains that these directives are overly broad and have no criteria, process, or description as to who will fall into the category.[4]

Plaintiff further raises Fourteenth and Eighth Amendment equal protection and deliberate indifference claims, stating that he is being treated differently than other inmates classified to administrative segregation and that the conditions of his SMU cell assignment subject him to cruel and unusual punishment.[5] In addition, he claims his forced participation in the BMP violates his First Amendment rights as the program seeks to "change the way [he] thinks and believes through psychological approaches and solitary conditions." ECF No. 1 at 9. He states that if he does not want to accept the psychological treatment, he will remain in solitary confinement without regard to his adjustment history. Plaintiff claims that DOC directives grant him the right to refuse the BMP. He seeks declaratory and injunctive relief, along with punitive and compensatory damages.

In response to the complaint defendants assert that plaintiff is a verified member of the Black Gorilla Family (BGF) prison gang, is currently serving a 32-year sentence for first-degree murder,

---

[4] Plaintiff also alleges that the defendants failed to comply with the notice and comment requirements of the Maryland Administrative Procedure Act in implementing the Quality of Life or BMP program regulations. ECF No. 1 at 6-7; *see* Md. Code, State Government, § 10-111(a). As the court has determined that summary judgment is appropriate on the plaintiff's federal claims, the court declines to exercise its supplemental jurisdiction over his state law claim. *See* 28 U.S.C. § 1367(c)(3); *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). The claim will be dismissed without prejudice.

[5] Plaintiff claims he is only allowed one hour of weekly outdoor recreation in a "cage" during which he must remain in full restraints (leg irons, handcuffs, security box, and waist chain), allowing him limited mobility. ECF No. 1 at 8. He further asserts that restraints (handcuffs and leg irons) are tightly applied and cut into his wrists and ankles. *Id*. Plaintiff alleges that from August of 2007 to the end of January 2008, he has been allowed out of his cell approximately 25 times to shower and 9 to 11 times to engage in outside recreation, putting him at risk of physical and psychological deterioration. *Id*.

and has a 38-page adjustment history which includes acts of violence along with drug and weapons possession. ECF No. 18, Ex. 1 at 4; ECF No. 46, Ex. 1 at 1, 4-6, 15-17. On June 14, 2007, MCIH had a riot in both courtyards and plaintiff's letters were recovered by officers during a mass search to identify which inmates were involved in these assaults.[6] ECF No. 18, Ex. 1 at 4. It was during this search that MCIH intelligence officers collected several letters or "kites," one of which noted that plaintiff ordered a "hit" on another inmate. In another letter, plaintiff allegedly identified himself as a high-ranking member of the BGF.[7] *Id.*; ECF No. 44, Ex. 1; ECF No. 45. Plaintiff was assigned to MCIH administrative segregation pending case management team action, as he was deemed a danger to the security of MCIH, inmates, and/or staff. ECF No. 18, Ex. 1 at 7-10. MCIH Sergeant Caudo was assigned to investigate allegations of plaintiff's BGF gang affiliation. *Id.*, Ex. 1 at 10. It was determined that plaintiff was to remain on administrative segregation for 120 days to allow for a more complete investigation. *Id.* On July 3, 2007, plaintiff received notice that he had been assigned to administrative segregation because "reasons existed to believe that he posed a danger to the institution and/or inmates and/or staff." *Id.* at 9-10.

On July 5, 2007, MCIH case management removed plaintiff from administrative segregation, classified him to unassigned administrative segregation, and placed him on the list for transfer to NBCI. ECF No. 18, Ex. 1 at 7. Warden Rouse approved the recommendation and signed her approval on July 6, 2007. On July 30, 2007, plaintiff underwent a case management review during which he had the opportunity to challenge the appropriateness of his administrative segregation assignment. ECF No. 18, Ex. 1 at 11. On or about August 2, 2007, plaintiff was identified as a

---

[6] While housed at MCIH, plaintiff was placed on a "mail cover," which involved screening all his incoming and outgoing mail with the exception of legal correspondence. ECF No. 18, Ex. 1 at 4.

[7] It is defendants' contention that emails between intelligence officers at MCIH and NBCI showed that plaintiff used letters or "kites" to order "hits" on other inmates, including BGF gang members, for failing to follow his instructions. ECF No. 18, Ex. 1 at 5; Exs. 44 & 45.

4

candidate for placement in NBCI's SMU and transferred to NBCI. *Id.*, Ex. 1 at 11-12. Upon arrival at NBCI plaintiff received an administrative segregation review and was initially assigned to NBCI administrative segregation for further review of placement on levels in the SMU, Quality of Life program, renamed the BMP. *Id.*, Ex. 1 at 13-15; ECF No. 46, memorandum at 2 n.1. Defendants state that plaintiff was identified as an influential gang member by the BMP committee and placed in the entry level or "gang level" of the BMP at NBCI on August 7, 2007. ECF No. 18, Ex. 1 at 13-16. The warden designee concurred with the recommendation of the committee on August 10, 2007. *Id.*[8]

On August 28, 2007, approximately four weeks after his transfer to NBCI and three weeks after his SMU placement, plaintiff underwent his first BMP review. ECF No. 18, Ex. 2 at 14. The BMP committee agreed to keep him at the intake (ground) level due to his refusal to participate in the program.[9] *Id.* He remained at the intake level until April 8, 2008, because he refused to attend or participate in the BMP meetings. *Id.* at 7-16. In April of 2008, the BMP was made voluntary with persons opting not to participate in the program being removed from the intake level of the program and placed on administrative segregation.[10] *Id.* at 15. On April 9, 2008, plaintiff signed an

---

[8] The program committee consisted of a chief psychologist, psychology associate, social worker, case manager, intelligence officer, housing unit sergeants from two day time shifts, housing unit manager, designated correctional officer, and the program historian. ECF No. 18, Ex. 3 at 10-11.

[9] At the intake level of the BMP, inmates are permitted two showers per week, one day of recreation in three-piece restraints per week, and no visits except legal or clergy. ECF No. 18, Ex. 3 at 7. Inmates are required to stay at this level until they: (1) complete and turn in the program pre-test so as to move to Level 1; and (2) give a verbal commitment to participate in the program. *Id.* Levels 1 through 5 feature increased privileges and behavioral expectations. *Id.*

[10] Defendants insist that participants were never "forced" to participate in the program. ECF No. 18, Ex. 2 at 3. They claim, however, that up until March or April of 2008, an inmate's refusal to participate meant that he remained at the intake level of the program until he elected to participate. *Id.*; *see also* ECF No. 18, Ex. 5 at 6 (Case Management Manual, revised in February of 2008, dictates that an inmate who refused to participate in the BMP was to remain at the intake level indefinitely).

5

informed consent form, opting out of the BMP and was reclassified to administrative segregation.[11] *Id*., Ex. 1 at 20.

Defendants acknowledge that the program, initially implemented in January 2007, underwent many changes after several gang-related incidents of violence in DOC facilities and it was "difficult to discuss the behaviors that resulted in… placement in the program as many of the individuals were influential in security threat activity." ECF No. 18, Ex. 2 at 5. In addition, defendants concede that the process for placement in the program was not clear, resulting in a number of individuals being placed at NBCI with little or no documentation to support the allegation they were a threat to the security of the institution. *Id.* Prior to being transferred to the SMU, a form for each inmate was supposed to be filled out by the sending institution and approved by the regional assistant commissioner and the assistant commissioner for programming. *Id.* This approval process was not done for approximately 90 inmates who were transferred to the SMU at NBCI as "emergency" transfers. *Id.* Once housed at NBCI, the emergency transfers received a case-by-case review by NBCI staff after the inmates' arrival. *Id.* A review of all of the inmates was not completed until October of 2007. This resulted in 42 participants being discharged from the program because there was little, if any, documentation supporting their continued placement in the program. *Id*.

Inmates like plaintiff, who opted not to participate in the BMP, were forced to remain at the initial intake level indefinitely and could not advance unless they decided to participate in the BMP. ECF No. 18, Ex. 2 at 3. Defendants admit that participation in the program was mandatory until April 2008, when the mandatory status was rescinded by the Assistant Commissioner of Correction.

---

[11] Defendants maintain that an inmate assigned to administrative segregation is reviewed by case management personnel at least once every 30 days. If the inmate remains on administrative segregation for one continuous year, a report detailing the circumstances of his status is to be forwarded to DOC headquarters for review by the Commissioner or his designee. ECF No. 18, Ex. 2.

*Id* at 6. At that time if inmates in the SMU did not participate in the BMP, they were assigned to administrative segregation. *Id.* The inmates were told they would remain in administrative segregation status until something could convince the Assistant Commissioner that they were no longer a threat to the security of the institution. *Id.* They were further informed that the only manner upon which they could be removed would be to complete the BMP so as to establish they were not a threat. *Id.* While on administrative segregation, inmates were reviewed by case management personnel at least once every 30 days and case managers were to consider available alternatives to continued administrative segregation. ECF No. 18, Ex. 1 at 22-29; Ex. 5 at 2-3.

While housed at NBCI, plaintiff received an infraction for fighting and was placed on disciplinary segregation for sixty days on or about January 6, 2009. ECF No. 44, Ex. 5 at 16. As previously noted, he did not participate in the BMP, but completed the BMP cognitive program "Taking a Chance on Change." *Id.* He was removed from NBCI administrative segregation on September 23, 2009, and placed in general population, per a decision from DOC Headquarters. ECF No. 44, Ex. 5 at 1, 18-19. Plaintiff was assigned to disciplinary segregation due to an infraction on or about December 22, 2009, and received 150 days of segregation. *Id* at 1, 3. He was returned to general population on May 6, 2010, after serving his segregation sentence. *Id.* at 3.

In his opposition, plaintiff focuses on his claim that confinement on the SMU at NBCI constitutes an atypical and significant hardship giving rise to a liberty interest. ECF No. 21. He states that he should have been accorded a due process hearing and notification of the factual basis for the charges against him. Plaintiff complains that his stay in SMU was for an "indefinite" period of time, limited only by defendants' discretion and completion of the BMP.[12] He maintains that the

---

[12] Plaintiff asserts that as he remains housed on administrative segregation at NBCI until such

SMU confinement constitutes an atypical and significant hardship under the cases of *Wilkerson v. Austin*, 545 U.S. 209 (2005) and *Farmer v. Kavanaugh*, 494 F. Supp. 2d 345 (D. Md. 2007), because of the indefinite duration, extreme isolation and restrictions on the SMU, and his inability to earn diminution credits to shorten the length of his sentence. ECF No. 21 at 6-9. He claims that he is entitled to process that provides him fair notice of the factual reasons for his assignment, an opportunity to respond, and an administrative decision which provides him a short statement of the reasons for the decision. *Id*. at 17-19. Plaintiff argues that defendants have failed to come forward with evidence justifying his placement on SMU and asserts that even though he has been assigned to administrative segregation since April of 2008, he no longer receives monthly classification reviews to screen his custody status and to examine the reasonableness of continuing his confinement on administrative segregation. *Id.* at 22.

**Standard of Review**

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

---

time as he can demonstrate to administrators he is no longer a threat to the institution, other inmates or staff, the duration of his confinement is limited only by the discretion of the Commissioner and he could be held on administrative segregation for the remainder of his sentence. ECF No. 21 at p. 13.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## Analysis

### Mootness

Defendants assert that plaintiff's complaint for injunctive relief is now moot because he is no longer assigned to administrative segregation. ECF No. 46 at 3-4. They note plaintiff was reassigned to general population at NBCI in September of 2009. ECF Nos. 44 & 46. Plaintiff claims that the claims are not moot because an actual controversy remains in existence. ECF No. 48.

" '[A] case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *United States v. Hardy,* 545 F.3d 280, 283 (4th Cir. 2008) (quoting *Powell v. McCormack,* 395 U.S. 486, 496 (1969)). "'The inability of the federal judiciary to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.'" *Id.* (quoting

*DeFunis v. Odegaard,* 416 U.S. 312, 316 (1974)). An actual controversy must exist at all times while a case is pending, including cases under 42 U.S.C. § 1983. *Steffel v. Thompson*, 415 U. S. 452, 459 n.10 (1974). It is possible for events subsequent to the filing of the complaint to make an injunctive relief request moot. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). This is so even though such a case presented a justiciable controversy at an earlier point in time and an intervening event rendered the controversy moot. *Calderon v. Moore*, 518 U.S. 149, 150 (1996). Indeed, "[w]here on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary juridical pronouncements on even constitutional issues obtained." *Lewis v. Continental Bank* Corp, 494 U.S. 472, 480 (1990). To the extent that plaintiff is seeking injunctive relief, the claim was mooted when he was released from administrative segregation and reassigned to general population. His claim for damages for the past wrongs alleged, however, is not moot, and will be analyzed below.

**Due Process Claims**

Administrative Segregation Assignment

In the prison context a liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U. S. 472, 484 (1995). Following the reasoning of the Supreme Court in *Sandin*, the court finds no liberty violation implicated in the decisions associated with plaintiff's initial placement on administrative segregation at MCIH, as it is not atypical for inmates to be placed on administrative segregation for any number of reasons. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983); *Beverati v. Smith*, 120 F.3d 500, 503-04 (4th Cir. 1997). Plaintiff was transferred to NBCI

and remained on segregation. His classification level was not increased to maximum security until a recommendation for that level was approved based on his history of disciplinary infractions and intelligence reports that he was a leader of a special threat group, the BGF, and had been ordering hits on other prisoners. The court finds there is nothing in the record which shows that the nature of plaintiff's assignments to administrative segregation at MCIH and NBCI comprised the atypical hardships contemplated by *Sandin* or *Beverati*. Therefore, they do not implicate a liberty interest. Further, plaintiff's transfer to NBCI does not in and of itself implicate a liberty interest; he has no entitlement to notice and an opportunity to be heard prior to his transfer, as a prisoner has no liberty interest in being housed in any particular prison facility. *See Olim v. Wakinekona*, 461 U.S. 238, 244-45 (1983); *Meachum v. Fano*, 427 U.S. 215 (1976).

## SMU Assignment

The restrictions which are the subject of plaintiff's complaint were imposed in August of 2007, when plaintiff was assigned to the SMU at NBCI. This court must determine if the conditions under which he was confined while in the SMU constituted an atypical and significant hardship.

There is no argument that the conditions of NBCI SMU at the intake level are extremely restrictive, controlled, monitored, and isolated. According to the record, Plaintiff remained so confined for approximately 240 days, from August 7, 2007 to April 8, 2008. Intake level inmates are housed alone, have no visits aside from attorneys or clergy, receive limited property privileges, and receive no commissary. The only time an intake level inmate may come out of his cell is to take a shower or to participate in "recreation" once or twice a week. The physical contact between inmates and between inmates and officers is severely limited.

The Supreme Court examined the due process issue involving inmates confined at the Ohio State Penitentiary ("OSP"), a super-maximum security prison where almost all human contact was prohibited and communication between cells was forbidden, to determine whether a liberty interest was created in the isolated confinement and if so, what due process was to be afforded to the inmate so confined. *See Wilkinson v. Austin*, 545 U.S. 209 (2005). At the OSP, exercise was limited to one hour a day in a small indoor room and the inmates were exposed to light 24 hours per day. *Id.* at 224. *Wilkinson* recognized that the deprivations of solitary confinement exist in most solitary confinement facilities and looked at the presence of added factors to find "an atypical and significant hardship" on inmates such that they had a liberty interest in avoiding it.[13] *Id*. These factors were (1) the potentially indefinite length of detention, limited only by the length of the underlying sentence, and (2) being rendered ineligible for parole due to confinement. *Id*. The Supreme Court found that "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context," triggering a protected liberty interest in avoiding placement on such confinement. *Id*. *Wilkinson* thus instructs lower courts to consider the totality of circumstances in a given facility. *Id*.

Applying the Supreme Court's rationale in *Wilkinson*, this court found that a transfer to the Maryland Correctional Adjustment Center ("MCAC"), a super-maximum security facility, implicated procedural due process protections, and concluded that:

> In light of the prohibition of "almost all human contact," coupled with severe restrictions on movement or any type of activity, both of which may last for the duration of some inmates' underlying sentences, and may be less likely to be relieved

---

[13] While *Wilkinson* involved transfer to and housing in the isolated confinement of a "supermax" facility, it involved similar solitary confinement issues found here-- isolated human contact for potentially "indefinite" periods. Therefore, the court finds *Wilkinson* instructive for due process analysis purposes.

by parole than the less arduous conditions at other facilities, the conditions at MCAC create such a hardship when judged against "any plausible baseline." Inmates thus have a protected liberty interest in avoiding transfer to MCAC.

*Farmer v. Kavanaugh*, 494 F. Supp. 2d 345, 358 (D. Md. 2007).

Plaintiff describes the conditions imposed in the SMU as follows. All property was confiscated and privileges were revoked, with the exception of one weekly hour of fresh air, in full restraints. Two weekly showers were to be provided, but could be revoked for minor offenses, such as talking or writing "kites" to other inmates or covering cell lighting, which is on 24-7. ECF Nos. 1 & 21. These restrictive conditions of intake level, together with the initial mandatory nature of the program, approach the type of conditions this court has found to trigger a protected liberty interest.

At the time plaintiff was assigned to the SMU, inmates were informed that they must participate in the BMP in order to earn their way out of the SMU, and if they opted out of the program they remained at the most restrictive intake level until they chose to participate. Plaintiff states that confinement in the SMU was of an indefinite duration. The indefinite duration of the confinement was created by the mandatory nature of program participation.[14] When the "mandatory" requirement was removed, inmates who chose not to participate in the BMP were assigned to administrative segregation and told they would remain so assigned until the Assistant Commissioner was convinced they were no longer a threat to the security of the institution. Inmates were told that the only way they could convince the assistant commissioner was to participate in the

---

[14] The difference between this case and *Farmer* is that the length of plaintiff's stay on various SMU levels was, to some extent, in his own hands. The ability to move forward and to earn more privileges is based on the behavior of the inmate participants and does not rely solely on the discretion of a single decision-maker. In addition, the SMU policy requires regular reviews of the inmate participant's status. The record evidence shows that reviews were conducted in plaintiff's case, albeit in a cursory manner due to his refusal to participate in the BMP.

13

BMP. Even when participation in the BMP was deemed "voluntary," it was clear that participation was required if an inmate had any desire to return to general population. Thus, the assignment to administrative segregation for non-participants was indefinite.

At no point in his complaint does plaintiff claim that his housing on SMU and his lack of participation in programming and institutional job assignments adversely effected his eligibility for parole. Any such claim, however, would lack evidentiary support. First, unlike the *Wilkinson* inmates, plaintiff's assignment to the SMU did not render him ineligible for parole for the duration of his stay. Second, plaintiff's lengthy 32-year sentence for a violent offense and his gang affiliation are factors weighing against his suitability for parole. Third, given plaintiff's poor institutional record it is impossible to discern whether a similar effect on his ability to participate in programming and earn good conduct, education, or industrial ("diminution") credits would have occurred had he not been assigned to the SMU. Thus, the undersigned does not find plaintiff's assertions regarding parole eligibility persuasive; however, the indefinite duration of the restrictive conditions does give rise to a liberty interest entitling plaintiff to due process protections arising at the time of assignment to the SMU.

The *Wilkinson* Court found that the process provided to Ohio inmates assigned to OSP complied with due process protections, noting that the Ohio inmates received written notice 48 hours in advance of a hearing "summarizing the conduct or offense triggering the review" and were provided a prepared form explaining why the review was initiated. *Wilkinson*, 545 U.S. at 216. The Ohio inmates were permitted to attend the hearing where they were allowed to offer "pertinent

14

information, explanation and/or objections to OSP placement and [could] submit a written statement," but could not call witnesses. *Id*. In addition to the notice and hearing, the Ohio system included a review of the committee's decision by the warden, who was to provide reasons for an approval of an assignment, as well as an additional review by a Bureau which was vested with final decision- making authority over all inmate assignments in Ohio. *Id*. at 217. After these reviews were completed, the inmate was allowed 15 days to file objections with the Bureau and only after this 15-day period expired was the inmate transferred to the facility. *Id*. Inmates who were transferred were given another review within 30 days of their arrival and, thereafter, were reviewed yearly. *Id*.

> The three factors to be balanced to determine how much process is due are:
>
>> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Wilkinson*, 545 U.S. at 224-225, *citing Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

Defendants were directed to file under seal all documentation concerning any investigation into plaintiff's alleged gang association. Although the precise content of the intelligence documentation filed will not be revealed in order to preserve the nature of the investigative techniques employed, it is clear from the content that prison officials had reason to believe plaintiff was a high-ranking member of the BGF, was involved in a riot at MCIH in July of 2007, and had numerous infractions. ECF No. 44 & 46. Most alarming among the items of evidence was a letter

wherein he threatens a hit on other inmates. *Id*. While plaintiff claims that he was never placed on notice of and was not given an opportunity to refute the allegations that he is a gang member and had an adjustment history,[15] his protest is belied by the record. *See, e.g.*, Request for Administrative Remedy by Freddie Bradshaw (Aug. 15, 2007), ECF No. 18, Ex. 1 at 43 (acknowledging receipt of a "memorandum by Warden Rouse, stating that I was identified as a member of a gang").

As a prisoner, plaintiff is not entitled to the process due to persons who remain at liberty. "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson*, 545 U.S. at 225. He is not entitled to an adversarial hearing, witnesses, evidence introduction, or other protections of a full trial.

Plaintiff acknowledges that he was told he was being assigned to administrative segregation because he was believed to be a threat to the security of the institution. The exigencies present explain why notice was not provided before plaintiff was assigned to administrative segregation. Expertise of prison officials in matters of security must be given due deference. *See Sandin v. Conner*, 515 U.S. at 482. Defendants admit that a large number of the 90 inmates initially assigned to the SMU were assigned erroneously, but those inmates were processed out of the program when it was discovered there was no supporting documentation warranting their assignment. *See* ECF No. 18, Ex. 2 at 5. Thus, there were safeguards in place to correct erroneous deprivations. Plaintiff's assignment, however, was supported by documentation of his gang involvement. *See* ECF No. 44 &

---

[15] *See* ECF No. 21.

46.

While the process provided to inmates at NBCI did not provide for as many levels of administrative review as provided to the inmates in *Wilkinson*, the reviews occurred monthly rather than annually. The undersigned finds that the process afforded to plaintiff met minimal constitutional standards.

**Equal Protection Claims**

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). To show that his equal protection rights were violated plaintiff must demonstrate that he was treated differently from similarly situated inmates and the discrimination was intentional or purposeful. *Williams v. Hansen*, 326 F.3d 569, 576 (4th Cir. 2003). If the discrimination was based on plaintiff's membership in a suspect class, the differential treatment must be narrowly tailored to a compelling interest; otherwise, plaintiff must show that the discrimination did not bear a rational relationship to a legitimate government purpose. *See Cleburne*, 473 U.S. at 440-42.

Viewing the facts and papers in a light most favorable to plaintiff, he presents no genuine dispute of fact supporting a claim that the denial of his privileges violated equal protection. Plaintiff has presented no evidence that his SMU and administrative segregation placements were based on a suspect classification. Rather, the evidence shows that he was so assigned because his gang involvement made him a security threat. ECF Nos. 44 & 46. The program was designed to "provide safety and security to the staff and inmates throughout the Division of Corrections" and to "reduce risky behavior." ECF No. 18, Ex. 3 at 4. This is a legitimate government purpose. *See Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) ("internal [prison] security [is] perhaps the most

legitimate of penological goals"). Curtailment of visitation, recreations, and property privileges, which emphasizes the connection between an inmate's "choices and consequences," ECF No. 18, Ex. 3 at 7, is rationally related to providing a safer prison environment. *See Overton*, 539 U.S. at 133. Defendants are entitled to summary judgment on plaintiff's equal protection claim.

### Eighth Amendment Claim

To the extent plaintiff alleges he was subjected to cruel and unusual punishment as a result of his approximately 250 days of confinement in the SMU, his claim fails. While the court does not condone the severe restrictions on exercise, "to withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). Notwithstanding the isolation plaintiff suffered in the SMU and his allegations that he had limited fresh air activities, causing him a bloody nose, and that the restraints used for out-of-cell activity cut his wrists and ankles (ECF No. 1 at pg. 8; ECF No. 21, Decl. at 3), there is no evidence that he suffered serious or significant physical or emotional injury as a result of his confinement.[16] Defendants are therefore entitled to summary judgment on any Eighth Amendment claim.

### First Amendment

Plaintiff claims that the BMP seeks to "change the way plaintiff thinks and believes through

---

[16] In his opposition declaration plaintiff for the first time claims that while on the SMU he had no access to the law library and "can only order cases from Baltimore via satellite service but only if I know the exact citation." ECF No. 21, Decl. at 4. Whether offered as a ground under the Fourteenth Amendment as a due process or access-to-courts claim, plaintiff has failed to allege a constitutional violation based upon this limited allegation.

psychological approaches and solitary conditions." ECF No. 1 at 9. He alleges that he made officials aware that he did not wish to speak or be in the BMP and as a result of his choice to be silent he remained in solitary confinement indefinitely. *Id*.

The First Amendment protects "the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). An inmate, however, does not retain those First Amendment rights that are "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S 817, 822 (1974). Thus, to show a violation of his First Amendment rights, an inmate must demonstrate that the restriction "serve[d] no legitimate penological goal and/or [was] not reasonably related to rehabilitation." *Folk v. Attorney General*, 425 F. Supp.2d 663, 673 (W. D. Pa. 2006).

The BMP was intended to "reduce risky behavior" of inmates "deemed a security threat to the good order of [the institution]," and to facilitate their "ultimate[]…return to a less restrictive environment." ECF No. 18, Ex. 3 at 4. Inmates were required to "give a verbal commitment to participate in the program" and to "demonstrate [r]espectful, appropriate behavior" to progress through the BMP levels. *Id*., Ex. 3 at 7. Plaintiff was placed in the BMP because he was deemed to be a high-ranking BGF gang member. ECF Nos. 44 & 46.

Plaintiff raises no genuine issue about the program's penological goal of "reducing risky behavior" and improving institutional safety or its reasonable relationship to his rehabilitation. *See Folk*, 425 F.Supp.2d at 673-74 (dismissing inmate's First Amendment claim arising from required participation in rehabilitative programs). Defendants are entitled to summary judgment on plaintiff's

First Amendment claim.

## Conclusion

In light of the above analysis, defendants' supplemental motion to dismiss or for summary judgment, construed as a supplemental motion for summary judgment, shall be granted as to all claims. A separate Order follows.[17]

Date: March 16, 2011  /s/
Catherine C. Blake
United States District Judge

---

[17] On January 5, 2011, plaintiff filed a motion for appointment of counsel. ECF No. 50. In light of the rulings entered by the court, the motion shall be denied.